**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| DIAMOND SAWBLADES MANUFACTURERS' COALITION; DIAMOND PRODUCTS, LIMITED; WESTERN SAW MANUFACTURERS, INC.; <br><br> Plaintiffs, <br><br> v. <br><br> DIAMOND TOOLS TECHNOLOGY, LLC; WUHAN WANBANG LASER DIAMOND TOOLS CO., LTD.; DIAMOND TOOLS TECHNOLOGY (THAILAND) CO., LTD.; DIAMOND TOOLS TECHNOLOGY CANADA, INC.; WANBANG DIAMOND TOOLS USA INC.; <br><br> Defendants. | **CASE NO. 1:19-CV-4674** <br><br> ———————————— <br><br> **JURY TRIAL DEMANDED** |

## <u>AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiffs Diamond Sawblades Manufacturers' Coalition and its individual members (collectively "DSMC" or "Plaintiffs"), through their undersigned counsel, file this Complaint against Defendants Diamond Tools Technology, LLC ("DTT"); Wuhan Wanbang Laser Diamond Tools Co., Ltd. ("Wuhan"); Diamond Tools Technology (Thailand) Co., Ltd. ("DTT Thailand"); Diamond Tools Technology Canada, Inc. ("DTT Canada"); and Wanbang Diamond Tools USA Inc. ("Wanbang"). Plaintiffs' claims arise from Defendants' fraudulent and anticompetitive scheme to destroy competition in the market for diamond sawblades and parts thereof sold in the United States. Defendants have acted in concert to evade trade regulations for the explicit purpose of undercutting prices for diamond sawblade products sold in United States commerce, and to share in ill-gotten profits that would have been lost to competition if Defendants had not conspired

1

with one another as they did.  DSMC seeks damages and equitable relief arising from Defendants'
unlawful conduct.

## INTRODUCTION

1.      "Dumping" is a practice in which a foreign manufacturer exports its products to
another country at less than "normal value" or under the cost of production.  When a foreign
manufacturer dumps goods in the United States, causing injury to the domestic producers of that
good, American industries may file petitions for relief with the U.S. Department of Commerce
("Commerce") and the International Trade Commission ("ITC") under the Tariff Act of 1930.

2.      If Commerce determines that a foreign good is being imported into the United
States and sold below normal value, and the ITC finds "material injury" or a threat of material
injury to the domestic producers of that good,[1] then Commerce will issue an antidumping order,
to be enforced by the U.S. Customs and Border Protection ("Customs").  Antidumping orders
impose duties on imports to remedy dumped prices.

3.      In May 2005, DSMC, an association of domestic diamond sawblade manufacturers
(and parts thereof) filed a petition with Commerce and the ITC, asserting that certain foreign
manufacturers of diamond sawblades were selling their products in the United States at dumped
prices which were materially injuring or threatening material injury to U.S. producers.  Commerce
conducted an investigation and issued a final determination confirming DSMC's allegations.
Specifically, and as relevant to this litigation, Commerce determined that Defendant Wuhan,
among other Chinese manufacturers, had produced and exported diamond sawblades to the United

---

[1] *See* 19 U.S.C. § 1673b(a) ("Preliminary determinations"); *id.* § 1673d(b) ("Final determinations");
*id.* § 1673e(b) ("Assessment of duty").

States at dumped prices.[2]   The ITC found, pursuant to a remand from the U.S. Court of International Trade, that Chinese imports were underselling and/or otherwise causing negative price effects in the domestic market, which threatened the U.S. producers with material injury.[3]

4.      In an antidumping order entered in November 2009 (the "Antidumping Order" or "Order"),[4] Commerce suspended liquidation of diamond sawblades from China, and directed Customs to collect a cash deposit on all unliquidated entries of diamond sawblades as of January 2009.  In other words, Commerce halted the final phase of the import process for Chinese diamond sawblades and required affected importers to place additional cash deposits for import duties before their merchandise could be sold in the United States.[5]   Commerce's order was pursuant to the ITC's finding that dumping of Chinese diamond sawblades had materially injured, or threatened to materially injure, the domestic producers of diamond sawblades.

5.      Five years after the Antidumping Order was entered, Commerce and the ITC conducted a routine "sunset review" to determine whether the Order remained necessary. Specifically, Commerce was required to investigate whether revocation of the Antidumping Order would result in a return to dumped prices, and the ITC examined whether revocation would likely lead to a continuation or recurrence of material injury to the domestic market for diamond sawblades.

---

[2] *Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 Fed. Reg. 29,303 (Dep't Commerce May 22, 2006) (final deter. of sales at less than fair value and final partial affirm. deter. of crit. circumstances), available at https://www.govinfo.gov/content/pkg/FR-2006-05-22/pdf/E6-7763.pdf

[3] *Diamond Sawblades and Parts Thereof from China and Korea*, Inv. Nos. 731-TA-1092, 1093 (Final) (Remand), USITC Pub. 4007 (May 2008) ("USITC Pub. 4007"), available at https://www.usitc.gov/publications/701_731/pub4007.pdf

[4] *Diamond Sawblades and Parts Thereof From the People's Republic of China and the Republic of Korea*, 74 Fed. Reg. 57,145 (Dep't Commerce Nov. 4, 2009) (antidumping duty orders), available at https://www.govinfo.gov/content/pkg/FR-2009-11-04/pdf/E9-26680.pdf

[5] Liquidation is the final computation or ascertainment of duties of imports.  *See* 19 C.F.R. § 159.1.

6.     Commerce determined affirmatively that revocation of the Order would lead to a return of Chinese producers selling at dumped prices.[6]  The ITC found that revocation of the Order would lead to a continuation or reoccurrence of material injury to the U.S. producers.  Specifically, the ITC determined that "there was significant underselling by subject imports during the period of review *even under the discipline of the order*," and that, "[d]espite an increase in apparent U.S. consumption of 6.4 percent during the [review] period, U.S. shipments, both by value and quantity, declined."[7]  Consistent with those findings, Commerce reissued the Antidumping Order for another five-year period.

7.     Notwithstanding Commerce's ongoing efforts to enforce the Antidumping Order, Defendants have worked cooperatively and continuously to evade it to the detriment of Plaintiffs.  Specifically, to circumvent the antidumping duties imposed on Chinese sawblades, Defendants have opened shell facilities in Thailand and Canada—countries that are not subject to the Antidumping Order—through which to fraudulently ship Chinese goods to the United States as "Thai" or "Canadian" goods.

8.     Based on evidence that Defendants have been transshipping Chinese diamond sawblades into the United States in that manner, specifically to circumvent the Antidumping Order, Commerce and the Department of Homeland Security ("DHS") have conducted investigations into Defendants' conduct and issued anticircumvention decisions and findings of wrongful evasion of the Antidumping Order.

---

[6] *Diamond Sawblades and Parts Thereof From the People's Republic of China*, 80 Fed. Reg. 12,797 (Dep't Commerce Mar. 11, 2015) (final results of the expedited sunset rev. of the antidumping duty order), available at https://www.govinfo.gov/content/pkg/FR-2015-03-11/pdf/2015-05558.pdf

[7] *Diamond Sawblades and Parts Thereof From China*, Inv. No. 731-TA-1092 (Review), USITC Pub. 4559 (Sept. 2015) (Rev.) at 29, 32 ("Sunset Review"), available at https://www.usitc.gov/publications/701_731/pub4559.pdf

9.      All the while, Plaintiffs have suffered substantial harm from Defendants' fraudulent activities.  By wrongfully evading and circumventing the Antidumping Order and selling sawblades and their parts at below-market prices, Defendants have directly caused—consistent with Commerce's and the ITC's findings in its most recent sunset review—Plaintiffs to have reduced sales and lower prices, thereby undercutting Plaintiffs' profits.  And while Commerce and DHS have attempted to prevent prospective harm through enforcement of the Antidumping Order and issuance of anticircumvention determinations, they have not—because they cannot—compensate Plaintiffs for the losses incurred.  This lawsuit seeks compensation for these losses caused by Defendants' coordinated and continuous circumvention of U.S. law.

## PARTIES

10.      Plaintiff DSMC is an *ad hoc* coalition originally consisting of nine domestic diamond sawblade producers.  Several members of the original coalition have gone out of business or exited the industry due to unfair competition from Chinese exports.

11.      Plaintiffs Diamond Products, Limited, located at 333 Prospect Street, Elyria, OH 44035, and Western Saw Manufacturers, Inc., located at 3200 Camino Del Sol, Oxnard, CA 93030, are the two remaining members of DSMC.  Diamond Products, Limited, is a domestic limited liability company organized and existing under the laws of Ohio.  Western Saw Manufacturers, Inc., is a corporation organized and existing under the laws of California.

12.      Defendant DTT is a corporation organized and existing under the laws of Indiana, having its principal place of business at 9339 Castlegate Drive, Indianapolis, IN 46256.  DTT sells diamond sawblades and parts thereof throughout the United States, including in this District.

13.      Defendant Wuhan is a Chinese producer of diamond sawblades that exports into the United States, including in this District.  Wuhan is located at No. 2808, Che Cheng Road, WEDZ, Wuhan, 430056, China.

14.     Defendant DTT Thailand is a subsidiary of Wuhan, which holds 99.997% of DTT Thailand's shares, having its principal place of business at 7/356 Moo 6, Mapyangphon, Pluak Daeng, Rayong, 21140, Thailand.  DTT Thailand exports diamond sawblades and parts thereof into the United States, including in this District.

15.     Defendant DTT Canada is an affiliate of DTT, having its principal place of business at 10&11-1575 Sismet Road, Mississauga, Ontario L4W 1P9, Canada.  DTT Canada exports diamond sawblades and parts thereof into the United States, including in this District.

16.     Defendant Wanbang is affiliated with Wuhan and DTT, having its principal place of business at 9339 Castlegate Drive, Indianapolis, IN 46256.  On information and belief, Wanbang assists DTT in importing diamond sawblades and parts thereof throughout the United States, including in this District.

## JURISDICTION

17.     This Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, or committed overt acts directly or through its agents in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The scheme and conspiracy have been directed at, and have had the intended effect of causing injury to, persons and corporations residing in, located in, or doing business throughout the United States, including in this District.

18.     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  A number of DSMC's claims arise under federal law, including under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d).  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' Indiana claims because they relate to the federal statutory claims and form part of the same case or controversy under Article III of the United States Constitution.

19.     Venue is appropriate in this District under 28 U.S.C. § 1391(b).  Defendants transact business, are found, or have agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District. Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on the interstate commerce of the United States, including in this District. Moreover, the effects of Defendants' conduct on interstate trade or commerce are ongoing.

## FACTUAL ALLEGATIONS

**A.     Commerce Enters an Antidumping Order Against Chinese Diamond Sawblades**

20.     On November 4, 2009, Commerce published the Antidumping Order on diamond sawblades and diamond sawblade segments from the People's Republic of China, A-570-900.  The Antidumping Order resulted from DSMC and its members demonstrating that Chinese exporters and their affiliated U.S. importers were underselling diamond sawblades and parts, which had harmful effects on the production, sales, and profits of domestic companies and their workers.

21.     The products covered by the Antidumping Order are finished circular sawblades with a working part comprised of a diamond segment or segments, and parts thereof, that are produced by Chinese manufacturers found to have engaged in dumping, including Wuhan.  Within the scope of the order are semi-finished diamond sawblades, including diamond sawblade cores and diamond sawblade segments.  A diamond sawblade segment consists of a mixture of diamonds (natural or synthetic) and metal powders (*e.g.*, iron, cobalt, nickel, or tungsten carbide) that are formed together into a solid shape.

**B.     Defendants Conspire to Circumvent and Evade the Antidumping Order via Thailand**

22.     It is unlawful to evade or circumvent antidumping orders that have been entered by Commerce.

23.     Commerce may find circumvention of an antidumping order if merchandise from a country that is subject to an antidumping order is completed or assembled in a third country before being imported to the United States, and that process of assembly or completion is only minor or insignificant.  19 U.S.C. § 1677j(b).  In such cases, Commerce may bring merchandise imported from the third country within the scope of the original antidumping order.

24.     Evasion of an antidumping order refers to "entering covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not applied with respect to the merchandise."  19 U.S.C. § 1517(a)(5)(A).  Evasion, in other words, requires evidence "not only that merchandise subject to an [antidumping order] was entered into the United States by the importer alleged to be evading, but that *such entry was made by a material false statement or act, or material omission*, that resulted in the reduction or avoidance of applicable [antidumping] cash deposits or other security."[8]   The Enforce and Protect Act of 2015 charges Customs with the responsibility for investigating allegations of evasion.  If Customs determines that an importer has evaded an antidumping order, it may suspend liquidation of the importer's entries, require the importer to post cash deposits on its entries, and/or refer the record to U.S. Immigration and Customs Enforcement for civil or criminal investigation.  19 U.S.C. § 1517(d).

---

[8] Memorandum from Troy P. Riley, Exec. Dir., Trade Remedy & Law Enf't Directorate, to Yan Li, Diamond Tools Tech. re: *Notice of Initiation of an Investigation of Diamond Tools Technology LLC and Determination as to Whether CBP Has Found a Reasonable Suspicion of Evasion of the Antidumping Duty Order on Diamond Sawblades from the People's Republic of China*, EAPA Case No. 7184 at 3 (June 27, 2017) (emphasis added), available at https://www.cbp.gov/sites/default/files/assets/documents/2017-Aug/TRLED%20Notice%20of%20Initiation%20of%20Investigation%20%287184%29%20-%20P.pdf

25.     After Commerce issued the Antidumping Order, Wuhan conspired promptly with its domestic importer, DTT, to circumvent and evade that order.  Specifically, DTT entered into an agreement with Wuhan to reroute Chinese diamond sawblades and parts thereof through DTT Thailand.  There, sawblades made by Wuhan in China could be repackaged as "Thai" sawblades for DTT to import and sell in the United States.  Additionally, parts of Chinese diamond sawblades were joined together in Thailand and wrongly imported into the United States as "Thai" products.  By falsely representing to Customs that the imports were Thai in origin, rather than Chinese, DTT was able to fraudulently circumvent the Antidumping Order and continue selling Wuhan's merchandise in the United States at less than fair-market value.[9]

26.     In a submission to Commerce, DSMC identified numerous facts illustrating Defendants' fraudulent transshipment of Chinese diamond sawblades and segments to the United States through Thailand.  For example, from 2012 to 2013, diamond sawblade imports from Thailand nearly doubled in value from $5.8 million to $11.4 million.  By 2016, the value of imports from Thailand was 615% higher than it had been in 2012.  Correspondingly, DTT's sales volume in the United States was markedly higher than it had been previously, while the prices at which DTT was offering imported "Thai" sawblades were well below prevailing market levels.

27.     Based on those red flags, DSMC sent an investigator to visit the DTT Thailand facility.  During the visit, the investigator observed a low level of production activity, learned that the facility had only 16 employees, observed a large quantity of crates in the warehouse with Chinese language labels, and found only a limited amount of equipment that would have been insufficient for significant production operations.

---

[9] *See* Xuepeng Liu and Huimin Shi, *Anti-Dumping Duty Circumvention through Trade Re-Routing: Evidence from Chinese Exporters* (Aug. 2016) at 7 (working paper) ("Successful evasion through re-routing requires a change of products' certificates of origins, which are used to define the nationality or origin of a product."), available at https://ssrn.com/abstract=2823249

28.     The investigator determined that DTT Thailand likely was engaged in the transshipment of Chinese origin diamond sawblades to the United States, and that Defendants had entered covered merchandise into the customs territory of the United States through evasion (*i.e.*, by falsely representing the origin of imported goods to avoid paying applicable duties).

29.     Finding DSMC's allegations credible, Customs initiated its own investigation of DTT and DTT Thailand.  On March 24, 2017, Customs requested information from DTT regarding the origin of its sawblades, including DTT Thailand's production records, factory profile, number of employees, production capacity, equipment used, and photographs of its manufacturing equipment and export documentation.  Customs also inquired as to DTT Thailand's ownership and relationship to DTT.

30.     DTT provided the requested information on April 25, 2017.  Finding DTT's submission "inconsistent" with the site visit findings of DSMC's investigator, Customs conducted its own site visit of DTT Thailand on June 21, 2017.

31.     During its June 21, 2017 site visit, Customs observed numerous irregularities at DTT Thailand's facilities.  For example, Customs observed packages of diamond sawblades with "Made in Thailand" labels affixed to the outside of the packaging.  But when Customs inquired as to the equipment used to create that type of packaging, DTT Thailand's representatives could not identify any equipment that could package in that manner.  DTT Thailand employees also gave inconsistent accounts of the facility's production capacity.  Additionally, Customs observed that DTT Thailand was storing unsegmented sawblades and other raw materials in the middle of the production floor and that packaged and finished goods awaiting shipment for export were simply stored on pallets on the production floor.  Due to this unusual method for storing raw materials

and finished goods, Customs asked whether DTT Thailand has any warehouse space. The answer was no. DTT Thailand also refused to let Customs inspect certain parts of the facility.

32.    Based on the foregoing, Customs determined there was a reasonable suspicion that diamond sawblades and sawblade segments imported by DTT from Thailand had entered the United States in evasion of the Antidumping Order. Accordingly, it entered Interim Measures bringing DTT Thailand's products temporarily under the scope of the Antidumping Order and ordering a rate adjustment of DTT Thailand's merchandise accordingly.[10]

33.    Customs also referred the matter to Commerce to determine whether DTT Thailand's sawblades in fact constituted covered merchandise. Specifically, Customs asked Commerce to determine whether DTT Thailand's minimal processing of Chinese merchandise was so minor or insignificant as to constitute circumvention of the Antidumping Order.[11]

34.    On November 15, 2018, Commerce issued a Preliminary Determination in the affirmative. It found that "diamond sawblades produced by Diamond Tools in Thailand using cores and/or segments from China and exported from Thailand to the United States *are* circumventing the antidumping order on diamond sawblades from China."[12] Therefore, DTT

---

[10] Memorandum from Troy P. Riley, Exec. Dir., Trade Remedy & Law Enf't Directorate, to Yan Li, Diamond Tools Tech. re: *Notice of interim measures taken as to Diamond Tools Technology LLC concerning a reasonable suspicion as to evasion of the antidumping duty order on Diamond Sawblades from the People's Republic of China*, EAPA Case No. 7184, (notices of initiation of inv. and interim measures) (U.S. Customs & Border Prot. June 27, 2017) at 2 ("Notice of Interim Measures"), available at https://www.cbp.gov/sites/default/files/assets/documents/2017-Aug/TRLED%20Notice%20of%20Interim%20Measures%20%287184%29%20-%20P.pdf

[11] On February 24, 2016, the Trade Facilitation and Trade Enforcement Act of 2015 was signed into law, which contains Title IV—Prevention of Evasion of Antidumping and Countervailing Duty Orders ("EAPA") (Pub. L. No. 114-125, 130 Stat. 122, 155 (2016)). Effective August 22, 2016, section 421 of the EAPA added section 517 to the Tariff Act of 1930, as amended (the Act), which establishes a formal process for Customs to investigate allegations of the evasion of antidumping and countervailing duty (AD/CVD) orders. Section 517(b)(4)(A) of the Act provides a procedure whereby if, during the course of an EAPA investigation, Customs is unable to determine whether the merchandise at issue is covered merchandise within the meaning of section 517(a)(3) of the Act, it shall refer the matter to Commerce to make such a determination.

[12] *Diamond Sawblades and Parts Thereof From the People's Republic of China*, 83 Fed. Reg. 57,425, 57,426 (Dep't Commerce Nov. 15, 2018) (prelim. affirm. deter. of circumvention) (emphasis added), available at https://www.govinfo.gov/content/pkg/FR-2018-11-15/pdf/2018-24939.pdf

Thailand's merchandise was brought within the scope of the Antidumping Order, and Commerce instructed Customs to suspend entries of merchandise from DTT Thailand that were produced using Chinese cores and/or Chinese segments.

35.     Following publication of the Preliminary Determination, Commerce invited interested parties (including Plaintiffs and DTT Thailand) to comment on its findings. Both parties submitted briefs, which Commerce considered before issuing its Final Determination.

36.     In a Final Determination issued on July 16, 2019, Commerce confirmed its earlier finding.[13] Specifically, Commerce found that diamond sawblades made with both Chinese cores and Chinese segments, which are minimally assembled in Thailand, constitute covered merchandise and are circumventing the Antidumping Order.

37.     As discussed in Commerce's accompanying Decision Memorandum:

> The issue is whether Diamond Tools is circumventing the AD order by joining Chinese cores and Chinese segments in Thailand and shipping the diamond sawblades to the United States . . . . Here, based on the statutory factors, we have analyzed the nature of the processing in Thailand to determine whether Diamond Tools is circumventing. As we explained above, we find that the nature of processing in Thailand is minor or insignificant for diamond sawblades made with Chinese cores and Chinese segments.[14]

38.     Accordingly, Commerce determined that "diamond sawblades made with Chinese cores and Chinese segments joined in Thailand by Diamond Tools and then subsequently exported from Thailand to the United States are circumventing the antidumping duty order on diamond sawblades from China" and that "it is appropriate to include this merchandise within the scope of

---

[13] *Diamond Sawblades and Parts Thereof From the People's Republic of China:*, 84 Fed. Reg. 33,920 (Dep't Commerce July 16, 2019) (final deter. of anti-circumvention inquiry) ("Final Determination"), available at https://www.govinfo.gov/content/pkg/FR-2019-07-16/pdf/2019-15084.pdf

[14] Issues and Decision Memorandum accompanying Final Determination at 13.

the antidumping duty order and to instruct [Customs] to continue to suspend any entries" of such merchandise into the United States.[15]

39.    Customs has similarly confirmed that DTT entered merchandise covered by the Antidumping Order into the customs territory of the United States through evasion.  Specifically, Customs' EAPA investigation produced substantial evidence that "DTT imported into the United States diamond sawblades from the People's Republic of China (China) through Thailand and claimed that the merchandise was Thai-origin" and "did not declare that the merchandise was subject to an [Antidumping] order upon entry[.]"  DTT's misrepresentations constituted material false statements or omissions.[16]

## C.    Defendants Expand the Conspiracy to Canada

40.    Undeterred by the Government's investigations and preliminary orders regarding their Thai operations, Defendants expanded and relocated their fraudulent scheme to circumvent the Antidumping Order and to enter Chinese sawblades into the United States at below fair-market value—this time to Canada.

41.    Between 2017 to 2018—*i.e.*, when Defendants' Thai operations came under governmental scrutiny—DTT opened a Canadian affiliate called "DTT Canada."  During that period, Canadian diamond sawblade exports to the United States more than tripled from $246,578 to $776,328.

---

[15] Final Determination, 84 Fed. Reg. at 33,920.

[16] *Notice of Final Determination as to Evasion*, EAPA Case No. 7184 (Sept. 17, 2019) at 1, available at https://www.cbp.gov/sites/default/files/assets/documents/2019-Sep/TRLED%20-%20Final%20Determination%20%28508%20compliant%29%20-%20September%2017%2C%202019%20-%20%287184%29%20-%20PV.pdf

42.     DSMC has reason to believe that Canadian facilities were joining Chinese cores to Chinese segments through a minor welding operation before exporting them to the United States as "Canadian" goods.

43.     On May 3, 2019, finding DSMC's allegations credible, Commerce initiated a further investigation regarding Canadian circumvention of the Antidumping Order by Canadian exporters.[17]

44.     On October 30, 2019, Commerce made another affirmative preliminary determination of circumvention in regard to Pro Tech Diamond Tools in Canada.[18]  DSMC has reason to believe that DTT Canada is engaged in a similar circumvention scheme.

## COUNT ONE (DEFENDANTS DTT AND WUHAN ("RICO DEFENDANTS"))

### Violations of RICO Act, 18 U.S.C. § 1962(c)

45.     Plaintiffs incorporate and reallege paragraphs 1–44 above by reference, as if fully set forth herein.

46.     The federal RICO statute provides, "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).

47.     The RICO Act further provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate

---

[17] Commerce's primary target in the Canadian investigation is another company not at issue in this litigation. *Diamond Sawblades and Parts Thereof from the People's Republic of China*, 84 Fed. Reg. 19,043 (Dep't Commerce May 3, 2019) (initiation of anti-circumvention inquiry), available at https://www.govinfo.gov/content/pkg/FR-2019-05-03/pdf/2019-09066.pdf

[18] *Diamond Sawblades and Parts Thereof from the People's Republic of China*, 84 Fed. Reg. 58,130 (Dep't Commerce Oct. 30, 2019) (prelim. affirm. deter. of circumvention), available at https://www.govinfo.gov/content/pkg/FR-2019-10-30/pdf/2019-23682.pdf

United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ." *Id.* § 1964(c).

48. Plaintiffs and the RICO Defendants all are "persons" as defined in 18 U.S.C. § 1961(3).

## A. The RICO Enterprise

49. Defendants have engaged in an ongoing association-in-fact enterprise formed for the common purpose of fraudulently increasing the RICO Defendants' market share in the United States market for diamond sawblades through fraudulent circumvention of the Antidumping Order (the "Circumvention Enterprise").

50. The Circumvention Enterprise consists of at least DTT, Wuhan, DTT Thailand, DTT Canada, and Wanbang and possibly others.

51. The Circumvention Enterprise qualifies as a RICO enterprise that is distinct from the RICO Defendants, themselves. Whereas the RICO Defendants are diamond sawblade manufacturers, importers, and repackagers, the Circumvention Enterprise is an association between them formed for the specific unlawful purpose of fraudulently exporting Chinese diamond sawblades and segments into the United States in circumvention of trade regulations. These actions were separate and distinct from any legitimate work the RICO Defendants performed in the ordinary course of their businesses.

52. Each Defendant is associated with the Circumvention Enterprise and, at a minimum, the RICO Defendants have participated directly or indirectly in its management or operation.

53. DTT imports and sells the merchandise that is at the center of this litigation throughout the United States. DTT is directly responsible for making the fraudulent statements that allowed the RICO Defendants' merchandise to enter the United States without the payment of

applicable duties, and for shipping that merchandise to the United States and on to DTT's customers through the mails at below-market prices that injured Plaintiffs. Moreover, when Commerce entered a Preliminary Finding to curtail Defendants' unlawful practices in Thailand, DTT opened DTT Canada for the specific purpose of carrying out the Circumvention Enterprise's purpose through further evasion of the law.

54.     Upon information and belief, Wuhan manufactures and exports all (or almost all) of the Chinese diamond sawblades and segments that are at the center of this litigation. Historically and continuing through today, Wuhan has dumped its goods in the domestic market. When Commerce entered the Antidumping Order to curtail Wuhan's injurious practices, Wuhan opened a Thai subsidiary (DTT Thailand) for the specific purpose of carrying out the Circumvention Enterprise's scheme through further evasion of the law. Specifically, in a practice known as "transshipping," Wuhan continues to funnel underpriced merchandise into the United States by exporting its goods to the United States through third countries who are not independently subject to the Antidumping Order. Wuhan does so with the knowledge and intent that those goods will be fraudulently misidentified as Thai or Canadian goods to circumvent applicable dumping duties.

55.     DTT Thailand and DTT Canada each knowingly receive covered merchandise from Wuhan and repackage it to facilitate the Circumvention Enterprise's circumvention and evasion of the Antidumping Order. Specifically, DTT Thailand and DTT Canada each receive covered merchandise from China and either (a) subject it to a minimal assembly process with the specific purpose of sending it on to the United States as "Thai" or "Canadian" goods, or (b) in the case of complete sawblades, simply transship the finished goods. DTT Thailand and DTT Canada take affirmative steps to remove indicia of Chinese origin from the covered merchandise and replace it

with fraudulent indicia of Thai or Canadian origin. Each company was formed for the specific purpose of carrying out mission-critical components of the Circumvention Enterprise's goals—namely, transshipping covered merchandise to fraudulently evade United States law.

56. The Circumvention Enterprise engages in, and its activities have an effect on, interstate commerce. The Circumvention Enterprise has engaged in tortious conduct that crossed state lines, spanning from China to Thailand to Canada to Indiana, and extending throughout the United States.

**B. Predicate Acts**

57. Plaintiffs hereby allege and set forth the following predicate racketeering activities as defined under 18 U.S.C. § 1961.

<u>Wire Fraud, in violation of 18 U.S.C. § 1343</u>

58. Federal law imposes criminal penalties on "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343.

59. Beginning no later than March 28, 2016 and continuing through the present, the RICO Defendants intentionally committed or caused to be committed numerous acts of wire fraud by offering for sale in the United States Chinese diamond sawblades and segments (*i.e.*, covered merchandise) through a scheme or artifice intended to obtain money by means of false pretenses and representations.

60.     Specifically, when the RICO Defendants were no longer able to dump Chinese diamond sawblades and segments directly into the United States, they transshipped the Chinese products through Thailand to circumvent the Antidumping Order.

61.     Wuhan shipped Chinese diamond sawblades and segments to DTT Thailand, where they were relabeled as "Thai" merchandise for export to the United States.  DTT then imported the "Thai" merchandise without paying applicable antidumping duties and sold it throughout the domestic market at injuriously low prices.

62.     Each time DTT imported diamond sawblades and segments to the United States from DTT Thailand, it falsely represented their origin to Customs for the specific purpose of evading the Antidumping Order.

63.     When the RICO Defendants were no longer able to evade the Antidumping Order through DTT Thailand, they began to transship Chinese diamond sawblades and segments through Canada.

64.     Wuhan shipped Chinese diamond sawblades and segments to DTT Canada, where they were either transshipped as finished diamond sawblades or underwent a minor welding procedure and were relabeled as "Canadian" merchandise for export to the United States.  The RICO Defendants knew that the procedure did not exempt the merchandise from the Antidumping Order and conducted the procedure solely to conceal their circumvention efforts.  DTT then imported the "Canadian" merchandise without paying applicable antidumping duties, and sold it throughout the domestic market at injuriously low prices.

65.     Each time DTT imported diamond sawblades and segments to the United States from DTT Canada, it falsely represented their origin to Customs for the specific purpose of evading the Antidumping Order.

66.     Through that scheme, the RICO Defendants unlawfully entered hundreds of thousands of dollars' worth of diamond sawblades to the United States and sold them to domestic consumers. In so doing, DTT made numerous material misstatements to Customs using interstate wires for the purpose of carrying out the Circumvention Enterprise's unlawful scheme.

67.     For example, based on publicly available bills of lading, the RICO Defendants submitted or caused to be submitted fraudulent wire statements on the following dates:

- On March 22, 2018, DTT Thailand submitted fraudulent documentation to Customs, via Customs' electronic interface, misrepresenting the country of origin for 4,716 kilograms of "Thai" diamond sawblades worth $55,861.02 that were shipped to DTT's U.S. distribution facility in Indianapolis, Indiana.

- On February 28, 2018, DTT Thailand submitted fraudulent documentation to Customs, via Customs' electronic interface, misrepresenting the country of origin for 2,938 kilograms of diamond sawblades worth $34,800.61 that were shipped to DTT's U.S. distribution facility in Indianapolis, Indiana.

- On February 13, 2018, DTT Thailand submitted fraudulent documentation to Customs, via Customs' electronic interface, misrepresenting the country of origin for 5,315 kgs of diamond sawblades worth $62,956.18 that were shipped to DTT's U.S. distribution facility in Indianapolis, Indiana.

68.     Including these three examples, between March 2016 and March 2018, DTT Thailand submitted at least nine fraudulent statements to Customs, via Customs' electronic interface, in connection with shipments of over 30,000 kilograms of diamond sawblades valued at over $300,000 to DTT's Indiana facility. During the same period, DTT Thailand submitted at least

fifty-three fraudulent statements to Customs in connection with shipments of diamond sawblades nationwide.[19]

69.    As a direct consequence of the RICO Defendants' actions, Plaintiffs have suffered injury to their business or property, including but not limited to, lost profits that would have been realized by Plaintiffs if the RICO Defendants had not engaged in a scheme to fraudulently circumvent United States trade regulations and sell underpriced products throughout the domestic market.

<u>Mail Fraud, in violation of 18 U.S.C. § 1343</u>

70.    Federal law imposes criminal penalties on "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing." 18 U.S.C. § 1341.

---

[19] Between March 2016 and March 2018, DTT Thailand submitted fraudulent documentation regarding the country of origin for numerous shipments throughout the United States including: 92,860 kgs of diamond sawblades worth $1,099,926.75 to Montclair, California; 18,761 kgs worth $222,224.06 to Thousand Oaks, California; 11,950 kgs worth $99,078.83 to Buffalo, IL; 2,265 kgs worth $26,828.93 to South Roy, Utah; 707 kgs worth $8.374.42 to Bronx, New York; and 226 kgs worth $2,676.98 to Lilburn, Georgia.

71.     As described fully above, beginning no later than March 28, 2016 and continuing through the present, the RICO Defendants used the U.S. mails to perpetrate their fraudulent scheme.

72.     Specifically, the RICO Defendants intentionally mailed, or caused to be mailed, through the U.S. Postal Service or other private or commercial interstate carrier (a) merchandise covered by the Antidumping Order, accompanied by (b) false or fraudulent documentation intended to enter that merchandise into the United States in circumvention of the Antidumping Order.  The RICO Defendants undertook these acts with the intent to injure the domestic market for diamond sawblades, including Plaintiffs, and to profit themselves.

73.     By shipping and/or causing to be shipped covered Chinese merchandise and false certifications of origin into and throughout the United States in furtherance of their fraudulent scheme, the RICO Defendants have intentionally committed numerous acts of mail fraud.

74.     At a minimum, the RICO Defendants committed mail fraud on the following dates:

- On March 22, 2018, DTT Thailand shipped via 4,716 kilograms of "Thai" diamond sawblades worth $55,861.02 to DTT's U.S. distribution facility in Indianapolis, Indiana, via first-class mail.

- On February 28, 2018, DTT Thailand shipped 2,938 kilograms of "Thai" diamond sawblades worth $34,800.61 to DTT's U.S. distribution facility in Indianapolis, Indiana, via first-class mail.

- On February 13, 2018, DTT Thailand shipped 5,315 kilograms of "Thai" diamond sawblades worth $62,956.18 to DTT's U.S. distribution facility in Indianapolis, Indiana, via first-class mail.

75.    Including these three examples, between March 2016 and March 2018, DTT Thailand made at least nine shipments of over 30,000 kgs of diamond sawblades valued at over $300,000 to the Indiana facility alone.  During the same period, DTT Thailand made at least 53 shipments in furtherance of Defendants' fraudulent scheme throughout the United States.

## C.    Continuous Pattern of Racketeering Activity

76.    The Circumvention Enterprise has engaged in a continuous pattern of racketeering activity involving multiple predicate acts that continues today.

77.    For over a decade, Wuhan has manufactured and exported, and DTT has imported and sold, dumped and underpriced diamond sawblades and segments subject to the United States antidumping laws.    When Commerce entered the Antidumping Order and curtailed the Circumvention Enterprise's original course of injurious dumping from China directly to the United States, DTT and Wuhan entered into agreements to form first DTT Thailand and then DTT Canada to further the Circumvention Enterprise's unlawful purpose.  To the extent Commerce halts DTT Canada's fraudulent circumvention, it is likely that the RICO Defendants will create a new phony entity through which to transship Chinese products to circumvent the Antidumping Order.

## D.    RICO Business Injury

78.    The RICO Defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs to be injured in their business and property.

79.    As the ITC determined in its Sunset Review:

- Dumping diamond sawblades into the U.S. has long threatened "material injury" to the domestic market, and "revocation of the antidumping duty order on diamond sawblades from China would be likely to lead to continuation or recurrence of material injury to an industry in the United States."

- That is because, "even under the discipline of the order," Chinese imports continue to be sold at prices well below market value, forcing domestic producers to decrease their own prices, or in some cases to cease production altogether.

- In the five years after the Antidumping Order was entered, "the volume and market share of subject imports in the U.S. market have remained significant."

- In fact, "subject imports' share of apparent U.S. consumption was *higher* over the period of review (ranging between 22.9 percent to 29.7 percent by value) than during the original [period of investigation] (ranging between 7.5 percent and 14.3 percent by value)."

- That is at least partly attributable to the fact that "there was significant underselling by subject imports during the period of review *even under the discipline of the order*." "Subject imports undersold the domestic like product in 69 out of 74 quarterly comparisons, with an average margin of underselling of 38.4 percent."

- To compete, domestic producers like Plaintiffs have been forced to decrease their own prices, resort to importing sawblades over manufacturing them, or cease domestic production altogether.

80. In other words, based on Commerce's and the ITC's findings, the RICO Defendants' fraudulent circumvention of the Antidumping Order necessarily harmed Plaintiffs. Plaintiffs have lost specific sales to the RICO Defendants as a result of the RICO Defendants' fraudulent conduct, and they have had to reduce prices, resulting in lost profits in an amount to be determined at trial.

## COUNT TWO (ALL DEFENDANTS)

### Conspiracy to Violate RICO Statute, 18 U.S.C. § 1962(d)

81.     Plaintiffs incorporate and reallege paragraphs 1–80 above by reference, as if fully set forth herein.

82.     The RICO Act provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions" of the Act.  18 U.S.C. § 1962(d).

83.     Defendants knowingly and willfully agreed to facilitate and participate in the Circumvention Enterprise that would affect interstate commerce through a pattern of racketeering activity.  At least Defendants DTT and Wuhan also agreed to manage and direct the Enterprise.

84.     Defendants shared the common objective of conducting the Circumvention Enterprise through a pattern of racketeering and, as described fully above, each have committed overt acts in furtherance of the conspiracy.

85.     Defendants agreed to engage in the above-mentioned racketeering actions to harm the domestic market for diamond sawblades and segments, including Plaintiffs' businesses.

86.     As a direct consequence and by reason of Defendants' conspiracy, Plaintiffs have been injured in their business and property, including in an amount of lost profits to be determined at trial.

## COUNT THREE (ALL DEFENDANTS)

### False Designation of Origin (Lanham Act § 43(a), 15 U.S.C. § 1125)

87.     Plaintiffs incorporate and reallege paragraphs 1–44 above by reference, as if fully set forth herein.

88.     Section 43(a) of the Lanham Act provides that "[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false

or misleading description of fact, or false or misleading representation of fact," which is likely to cause confusion as to the origin of his or her goods, "shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a)(1)(B).

89.     During its June 21, 2017 site visit to DTT Thailand, Customs observed packages of diamond sawblades with "Made in Thailand" labels affixed to the outside of the sawblades' packaging.  However, DSMC's, Commerce's, and Customs' investigations confirm that diamond sawblades and segments present at DTT Thailand were, in fact, Chinese in origin.

90.     By fraudulently relabeling covered Chinese merchandise as "Thai" or "Canadian" merchandise, or causing such Chinese merchandise to be relabeled in that manner, Defendants each have intentionally and willfully used false designations of origin in connection with their goods, or conspired to do so.

91.     Defendants' mislabeled goods have entered interstate commerce, having been imported to the United States by DTT and sold throughout the country.

92.     Plaintiffs have been damaged by Defendants' misrepresentations, which allowed Defendants to circumvent the Antidumping Order and sell underpriced goods in violation of the law.  As a direct consequence of Defendants' misrepresentations, Plaintiffs have been injured in their business and property, including in an amount of lost profits to be determined at trial.

## COUNT FOUR (ALL DEFENDANTS)

### Unfair Competition - Predatory Price Cutting (Indiana Common Law)

93.     Plaintiffs incorporate and reallege paragraphs 1–44 above by reference, as if fully set forth herein.

94.     By virtue of Defendants' unlawful acts and omissions, they have engaged in unfair competition.

95.     By relentlessly dumping their merchandise in the United States at prices below fair market value and/or the cost of production, and engaging in evasion of trade remedy orders, Defendants have engaged in predatory price cutting.

96.     Plaintiffs have a property interest in their respective businesses.

97.     Plaintiffs had the manufacturing and economic capacity to enter into valid business relationships but for Defendants' predatory pricing.

98.     Defendants' pricing is predatory because they intentionally cut their prices for the purpose of destroying Plaintiffs' competing businesses and restricting competition generally in the domestic market for diamond sawblades and segments.

99.     Defendants have sufficient market power to exclude competitors and have, in fact, contributed to driving down diamond sawblade prices and driving certain manufacturers out of the domestic market for diamond sawblades entirely.

100.    As a result of Defendants' predatory, fraudulent, willful, and unjustified conduct, Plaintiffs have lost specific sales and lowered prices, resulting in a reduction in profits in an amount to be determined at trial.

## COUNT FIVE (ALL DEFENDANTS)

### Unfair Competition - Tortious Interference (Indiana Common Law)

101.    Plaintiffs incorporate and reallege paragraphs 1–44 above by reference, as if fully set forth herein.

102.    By virtue of Defendants' acts and omissions, they have engaged in unfair competition.

103.    By underselling U.S. producers with dumped prices and illegal evasion of the trade remedy orders, and restricting competition in the domestic market for diamond sawblades,

Defendants have tortiously interfered with Plaintiffs' business relations and prospective economic advantage.

104.     Plaintiffs had valid business relationships with their customers and/or a reasonable expectation of entering into valid business relationships with diamond sawblade purchasers. But for Defendants' unlawful conduct, Plaintiffs would have maintained their customer relationships and entered into new ones.

105.     Defendants were aware of Plaintiffs' existing and prospective business relationships.

106.     Defendants intentionally and unjustifiably interfered with those relationships by unlawfully underpricing their merchandise, in willful and fraudulent circumvention and evasion of the Antidumping Order and applicable laws.

107.     As a result of Defendants' predatory, willful, and unjustified conduct, Plaintiffs have lost specific sales and lowered prices, resulting in a reduction in profits in an amount to be determined at trial.

## COUNT SIX (ALL DEFENDANTS)

### Civil Conspiracy

108.     Plaintiffs incorporate and reallege paragraphs 1–44 above by reference, as if fully set forth herein.

109.     Defendants entered into one or more agreements to compete unfairly by falsely designating the origin of their goods, unlawfully underpricing their merchandise, and tortiously interfering with Plaintiffs' business relations and prospective economic advantage.

110.     As described above, each Defendant actively participated in the civil conspiracy and committed several overt acts to further and effectuate the conspiracy through unlawful means.

111.    As a direct consequence of Defendants' conspiracy, Plaintiffs have lost specific sales and lowered prices, resulting in a reduction in profits in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, as a result of the foregoing, Plaintiffs pray for the following relief:

A.    Recovery of actual damages from Defendants according to proof at trial;

B.    An award of treble damages pursuant to 18 U.S.C. § 1964 (RICO) and/or 15 U.S.C. § 1117 (Lanham Act) from Defendants;

C.    Disgorgement of Defendants' profits pursuant to 15 U.S.C. § 1117;

D.    An award of punitive damages pursuant to Indiana common law (Unfair Competition) from Defendants;

E.    An award of attorneys' fees and costs incurred in connection with this action pursuant to 18 U.S.C. § 1964(c) and/or 15 U.S.C. § 1117;

F.    An injunction preventing Defendants from committing any further unlawful activity; and

G.    Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues triable to a jury.

Respectfully Submitted,

*s/Spiro Bereveskos/*

| | |
|---|---|
| Daniel B. Pickard (*pro hac vice* forthcoming) | Spiro Bereveskos |
| Stephen J. Obermeier (*pro hac vice* forthcoming) | Blake R. Hartz |
| Enbar Toledano (*pro hac vice* forthcoming) | WOODARD, EMHARDT, HENRY, |
| WILEY REIN LLP |     REEVES & WAGNER, LLP |
| 1776 K Street N.W. | 111 Monument Circle, Suite 3700 |
| Washington DC 20006 | Indianapolis, IN  46204-5137 |
| Phone: (202) 719-7000 | Phone: (317) 634-3456 |
| dpickard@wileyrein.com | Fax: (317) 637-7561 |
| sobermeier@wileyrein.com | judy@uspatent.com |
| etoledano@wileyrein.com | bhartz@uspatent.com |

#1704901