UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DIAMOND SAWBLADES MANUFACTURERS' ) | |
| COALITION, ) | |
| DIAMOND PRODUCTS, LIMITED, and ) | |
| WESTERN SAW MANUFACTURERS, INC., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:19-cv-04674-TWP-TAB |
| ) | |
| DIAMOND TOOLS TECHNOLOGY, LLC, ) | |
| WUHAN WANBANG LASER DIAMOND ) | |
| TOOLS CO., LTD., ) | |
| DIAMOND TOOLS TECHNOLOGY ) | |
| (THAILAND) CO., LTD., ) | |
| DIAMOND TOOLS TECHNOLOGY CANADA, ) | |
| INC., and ) | |
| WANBANG DIAMOND TOOLS USA, INC., ) | |
| ) | |
| Defendants. ) | |

**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS**

This matter is before the Court on four Motions to Dismiss filed under Federal Rule of

Civil Procedure 12(b)(6) by Defendants Diamond Tools Technology, LLC ("DTT") and Wanbang

Diamond Tools USA, Inc. ("Wanbang") (Filing No. 22), Diamond Tools Technology (Thailand)

Co., Ltd. ("DTT Thailand") (Filing No. 40), Diamond Tools Technology Canada, Inc. ("DTT

Canada") (Filing No. 52), and Wuhan Wanbang Laser Diamond Tools Co., Ltd ("Wuhan") (Filing

No. 65) (collectively, "Defendants"). The Plaintiffs Diamond Sawblades Manufacturers' Coalition

and its individual members Diamond Products, Limited and Western Saw Manufacturers, Inc.

(collectively "DSMC"), sued the Defendants for federal Racketeer Influenced and Corrupt

Organizations ("RICO") Act and Lanham Act violations and for prohibited predatory pricing,

tortious interference, and civil conspiracy under state law (Filing No. 5). Though the Defendants

filed four Motions to Dismiss, the arguments largely quadruple their desire to dismiss all claims forwarded by DSMC. The Court will consolidate contentions when most expedient and address individualized arguments where warranted. With that in mind, for the following reasons, the Motions to Dismiss are collectively **granted**.

## I.    <u>BACKGROUND</u>

The following facts are not necessarily objectively true, but as required when reviewing a motion to dismiss, the Court accepts as true all factual allegations in the amended complaint and draws all inferences in favor of DSMC as the non-movant.  *See Bielanski v. County of Kane*, 550 F.3d 632, 633 (7th Cir. 2008).

In May 2005, DSMC petitioned the U.S. Department of Commerce (the "Commerce Dept.") and the International Trade Commission ("ITC") "asserting that certain foreign manufacturers of diamond sawblades were selling their products in the United States at dumped prices"—that is, prices at less than normal value or under the cost of production—to undercut competition and corner the market (Filing No. 5 at 2).   After investigating, the Commerce Dept. determined, under the Tariff Act of 1930, that Wuhan and other Chinse manufacturers "had produced and exported diamond sawblades to the United States at dumped prices."  *Id*. at 2-3.  In 2009, the Commerce Dept. published the "Antidumping Order" on diamond sawblades and parts thereof from the People's Republic of China.   Underlying the Antidumping Order were two findings: first, the Commerce Dept. determined that diamond sawblade imports from China were being "dumped" into the United States at prices below fair value; and second, the ITC determined that those dumping[1] practices actually threatened the U.S. industry for diamond sawblades with material injury.  *Id*.  Under the Antidumping Order, the U.S. suspended liquidation of  diamond

---

[1] "Dumping" is a practice in which a foreign manufacturer exports its products to another country at less than "normal value" or under the cost of production. (Filing No. 5 at 2).

sawblades from China. "In other words, the Commerce Dept. halted the final phase of the import process for Chinese diamond sawblades." *Id.* at 3.

Five years later, the Commerce Dept. and the ITC conducted a review to see if the Antidumping Order remained necessary. *Id.* As part of this examination, "Commerce was required to investigate whether revocation of the Antidumping Order would result in a return to dumped prices, and the ITC examined whether revocation would likely lead to a continuation or recurrence of material injury to the domestic market for diamond sawblades." *Id.* After finding that lifting the order would lead to a return of dumped prices that would materially injure U.S. producers—and that "'there was significant underselling by subject imports during the period of review *even under the discipline of the order*'"—"Commerce reissued the Antidumping Order for another five-year period." *Id.* at 4 (emphasis in original).

Despite the Commerce Dept.'s efforts, Defendants continued to circumvent the Antidumping Order, opening "shell facilities in Thailand and Canada—countries that are not subject to the Antidumping Order—through which to fraudulently ship Chinese goods to the United States as 'Thai' or 'Canadian' goods" after relabeling, and at times, minor labor on the sawblades. *Id.* In response, and after further investigation, the Commerce Dept. and the Department of Homeland Security ("DHS") have "issued anticircumvention decisions and findings of wrongful evasion of the Antidumping Order." *Id.* In particular, the Government determined that, despite the Antidumping Order, domestic consumption of subject imports was markedly higher than during the original period of investigation, with Chinese sawblades and parts continuing to undersell domestic products by an average of 38.4%. *Id.* at 22-23. In their attempts to compete, domestic producers like Plaintiffs were forced to drop their own prices or import rather than manufacture diamond sawblades. *Id.* But many producers were simply forced to leave the

3

industry altogether. *Id*. Indeed, of the original nine members of the domestic Diamond Sawblades Manufacturers' Coalition, only two remain. *Id*. at 5. This continued conduct by the Defendants has directly caused DSMC's members "to have reduced sales and lower prices," undercutting their profits. *Id*. at 5. Though the Commerce Dept. and DHS have attempted to enforce the Antidumping Order and the anticircumvention decisions, these efforts have been unsuccessful because they cannot compensate DSMC's members for their losses. *Id*. Eventually, DSMC sued the Defendants in this Court for federal RICO and Lanham Act violations as well as for prohibited predatory pricing, tortious interference, and civil conspiracy under state law (*see* Filing No. 5).

## II.   LEGAL STANDARD

### A.   Dismissal Under Fed. R. Civ. P. 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a complaint that has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff. *Bielanski*, 550 F.3d at 633. However, courts "are not obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. Civ. P. 8(a)(2). In *Bell Atlantic Corp. v. Twombly*, the United States Supreme Court explained that the complaint must allege facts that are "enough to raise a right to relief above the speculative level." 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Id.*; *see also Bissessur v. Ind. Univ. Bd. or Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) ("it is not enough to give a threadbare recitation of the elements

of a claim without factual support"). The allegations must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citations and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

**B.    Dismissal Under Fed. R. Civ. P. 9(b)**

Because DSMC's RICO and Lanham Act claims flow from accusations of fraud, they are subject to the heightened pleading requirements of Federal Rule of Civil Procedure Rule 9(b). *See Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994); *Gensler v. Strabala*, 764 F.3d 735, 737 (7th Cir. 2014). Rule 9(b) states that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The Seventh Circuit has interpreted this particularity requirement to mean that the complaint must identify the "who, what, when, where, and how" of the alleged fraud. *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (citing *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019)). "What constitutes 'particularity,' however, may depend on the facts of a given case." *Berkowitz*, 896 F.3d at 839–40 (citing *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreens Co.*, 631 F.3d 436, 442 (7th Cir. 2011) (citations omitted)). This "heightened pleading requirement in fraud cases 'forces the plaintiff to conduct a careful pretrial investigation' to minimize the risk of damage associated with a baseless claim." *Id.* at 840 (quoting *Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 748–

5

49 (7th Cir. 2005)). That said, all "[p]leadings must be construed so as to do justice." Fed. R. Civ. P. 8(e).

## III.    DISCUSSION

### A.    RICO Claims

#### 1.    RICO Enterprise

RICO's Section 1962(c) prohibits entities from conducting the affairs of an enterprise though a pattern of racketeering. DSMC alleges that DTT and Wuhan (collectively the "Enterprise Defendants") "have engaged in an ongoing association-in-fact enterprise formed for the common purpose of fraudulently increasing the Enterprise Defendants' market share in the United States market for diamond sawblades through fraudulent circumvention of the Antidumping Order. (Filing No. 5 at 15.) This so-called "Circumvention Enterprise" is separate and distinct from the Enterprise Defendants individually, DSMC argues, in that it "is an association between them formed for the specific unlawful purpose of fraudulently exporting Chinese diamond sawblades and segments into the United States." *Id.* For its part, "DTT imports and sells the merchandise that is at the center of this litigation throughout the United States." *Id.* In this role, DTT made "the fraudulent statements that allowed the Enterprise Defendants' merchandise to enter the United States" and shipped "that merchandise to the United States and on to DTT's customers through the mails at below-market prices." *Id.* at 15-16. Moreover, when the Commerce Dept. curtailed the Thailand scheme, "DTT opened DTT Canada for the specific purpose of carrying out the Circumvention Enterprise's purpose through further evasion of the law." *Id.* at 16.

DSMC alleges that Wuhan, on the other hand, "manufactures and exports all (or almost all) of the Chinese diamond sawblades and segments that are at the center of this litigation." *Id.* When the Commerce Dept. shut down its dumping scheme, "Wuhan opened a Thai subsidiary

(DTT Thailand) for the specific purpose of carrying out the Circumvention Enterprise's scheme through further evasion of the law" by funneling "its goods to the United States through third countries who are not independently subject to the Antidumping Order." *Id.* Wuhan continues to move "goods to the United States through third countries who are not independently subject to the Antidumping Order," knowing that "those goods will be fraudulently misidentified as Thai or Canadian goods to circumvent applicable dumping duties." *Id.*

To implement this scheme, DSMC alleges, the Enterprise Defendants "intentionally committed or caused to be committed numerous acts of wire fraud" in violation of 18 U.S.C. § 1343. *Id.* at 17. Specifically, "[e]ach time DTT imported diamond sawblades and segments to the United States from DTT Thailand [and from DTT Canada], it falsely represented their origin to Customs for the specific purpose of evading the Antidumping Order[,] . . . using interstate wires for the purpose of carrying out the Circumvention Enterprise's unlawful scheme." *Id.* at 18, 19. For example, on three specific dates in February and March 2018, "DTT Thailand submitted fraudulent documentation to Customs, via Customs' electronic interface, misrepresenting the country of origin" of sawblades shipped to DTT's distribution facility in Indianapolis, Indiana. *Id.* at 19. In fact, "between March 2016 and March 2018, DTT Thailand submitted at least nine fraudulent statements to Customs, via Customs' electronic interface" for goods headed for Indianapolis. *Id.* Nationwide, DTT submitted at least fifty-three of these fraudulent statements during the same time period. *Id.* at 19-20.

All the while, DSMC maintains, the Enterprise Defendants committed mail fraud in violation of 18 U.S.C. § 1343 by intentionally mailing, or causing to be mailed, "(a) merchandise covered by the Antidumping Order, accompanied by (b) false or fraudulent documentation intended to enter that merchandise into the United States in circumvention of the Antidumping

Order." *Id.* at 21.  For example, in February and March 2018, DTT Thailand shipped thousands of kilograms of "Thai" diamond sawblades "to DTT's U.S. distribution facility in Indianapolis, Indiana, via first-class mail." *Id.*  From March 2016 to March 2018, DTT made at least nine of these shipments to Indianapolis. *Id.* at 22.  Across the U.S., "DTT Thailand made at least 53 shipments." *Id.*

DSMC alleges these predicate acts of wire fraud and mail fraud have, for over a decade, created "a continuous pattern of racketeering activity" that has enabled the Enterprise Defendants to further "the Circumvention Enterprise's unlawful purpose" of flouting the Antidumping Order for over a decade. *Id.*  Because of this circumvention, DSMC concludes, its members "have lost specific sales to the [Enterprise] Defendants as a result of the [Enterprise] Defendants' fraudulent conduct, and they have had to reduce prices, resulting in lost profits". *Id.* at 23.

In nearly identical sections of their separate briefs supporting dismissal, the Enterprise Defendants argue that DSMC's RICO claims against them fail to adequately allege (1) "proximate cause" of harm when "the Complaint alleges direct injury only to the U.S. government," (2) "that the purported mail and wire fraud was sufficiently continuous to constitute a pattern of racketeering activity," (3) that the purported mail and wire fraud were "through a RICO enterprise" and not merely part of the Defendants' "course of [ ] ordinary business activities," (4) that the Enterprise Defendants were "involved in the purported acts of mail and wire fraud," and (5) "the type of organized, long-term criminal activity that Congress sought to eradicate by enacting RICO." (Filing No. 23 at 7–8 (quotations omitted); Filing No. 66 at 7–9 (quotations omitted).) Because the Court can resolve this claim in the Enterprise Defendants' favor on the first grounds, it need not discuss the other four.

The Enterprise Defendants contend that "the [Amended] Complaint fails to plead a direct causal connection between the alleged predicate acts and [DSMC]'s injury" when the immediate victim of the scheme was the U.S. government by way of unpaid antidumping duties (Filing No. 23 at 15; Filing No. 66 at 11). The Enterprise Defendants argue that any injury sustained by DSMC was indirect because any purported "price undercutting … is … conduct entirely distinct from any alleged mail- and wire-fraud scheme to avoid antidumping duties." (Filing No. 23 at 16 (quotation omitted); Filing No. 66 at 11-12).   If anything, the Enterprise Defendants contend, that U.S. Customs and Border Protection ("Customs") should "vindicate the laws by pursuing [its] own claims" supports dismissal (Filing No. 23 at 17; Filing No. 66 at 12).

In response, DSMC argues that "injury was caused *directly* by Defendants' evasion of the Antidumping Order."  (Filing No. 29 at 15 (emphasis in original).)  Because antidumping duties are imposed "to protect American industries against unfair trade practices by foreign entities who sell in the American market," failure to pay them "leads to a continued dumping of goods—*i.e.*, continued direct injury to Plaintiffs." (Filing No. 67 at 12-13.)  "In other words, the primary victims of an evasion scheme like the one at issue here are domestic producers, and the failure to pay antidumping duties directly injures domestic producers, not the Government." (Filing No. 29 at 15.)  Even more, DSMC's members "have expended considerable resources investigating and petitioning the Government to address Defendants' fraudulent schemes." (Filing No. 67 at 14.)

In reply, the Enterprise Defendants argue that the Amended Complaint "does not, and cannot, allege the required direct causal connection between the submission of supposedly fraudulent documentation to [Customs] and DSMC's claimed lost sales and market share." (Filing No. 30 at 6; Filing No. 73 at 2.) Instead, DSMC draws "irrelevant and inaccurate distinctions between taxes and duties" to get around its proximate cause failure. *Id.*  "[T]he type or purpose of

the government levy," the Enterprise Defendants argue, "is irrelevant to whether Defendants' alleged conduct *proximately caused* DSMC's claimed injury." (Filing No. 30 at 9; Filing No. 73 at 5 (emphasis in originals).) Moreover, "[a]t no point did the government determine that any price reduction or loss of market share by DSMC was caused by DTT, Wanbang [or Wuhan], or any of the other Defendants". (Filing No. 30 at 8; Filing No. 73 at 4.)

DSMC's Amended Complaint asserts a claim against the Enterprise Defendants under Section 1962(c). But the private right of action for a violation of Section 1962(c) stems from 18 U.S.C. § 1964(c). *RWB Servs., LLC v. Hartford Computer Grp., Inc.,* 539 F.3d 681, 685 (7th Cir. 2008) ("The civil RICO cause of action arises under 18 U.S.C. § 1964(c)."). Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court...." 18 U.S.C. § 1964(c). More specifically, "[a] cause of action under § 1964(c) requires a plaintiff to plead '(1) an injury in its business or property (2) by reason of (3) the defendants' violation of section 1962.'" *DeGuelle v. Camilli,* 664 F.3d 192, 198 (7th Cir. 2011) (quoting *RWB Servs.,* 539 F.3d at 685 (internal quotation marks and brackets omitted)). To satisfy the "by reason of" requirement under Section 1964(c), DSMC "must prove, among other things, that 'the pattern of racketeering activity' both factually and proximately caused [the alleged] 'injur[y].'" *RBW Servs.,* 539 F.3d at 686 (quoting *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268 (1992)). "In examining whether a RICO violation proximately caused the plaintiff's injury, 'the central question . . . is whether the alleged violation led *directly* to the plaintiff's injuries.'" *Id.* at 688 (quoting *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 461 (2006) (emphasis added)).

In *Anza*, the Supreme Court, examining this proximate cause requirement, rejected a RICO enterprise claim based on a defendant failing to charge "sales tax to cash-paying customers" and

submitting fraudulent tax returns, thereby allowing it "to reduce its prices without affecting its profit margin." 547 U.S. at 454. Though these reduced prices would clearly hurt the plaintiff's rival business, the "direct victim" of the conduct was the state government, the court held, not the plaintiff. *Id.* at 458. The cause of the plaintiff's harm, then, was "a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* Whether the defendant defrauded the state in order to "gain a competitive advantage over" the plaintiff was, the court reasoned, "immaterial." *Id.* at 460. Ultimately, because the government was the "direct victim" of the defendant's conduct, the plaintiff's Section 1962(c) claim failed because it did not satisfy the proximate cause requirement under Section 1964(c). *Id.* at 458, 461.

The harm suffered by the plaintiff in *Anza* is akin to the harm borne here: the plaintiff in *Anza* alleged that it was harmed by the lost sales caused by the defendants' ability to charge lower prices due to its fraudulent practice of omitting sales tax and hiding that fact by submitting fraudulent tax returns. Here, DSMC alleges that its members have been harmed by lost sales caused by the increased competition in the diamond sawblades market, which was made possible by the Enterprise Defendants' allegedly fraudulent statements to Customs. Like the plaintiff in *Anza*, DSMC's members "lost sales could have resulted from factors other than [the Enterprise Defendants'] alleged acts of fraud." *Anza*, 547 U.S. at 459. As the *Anza* court explained, "[b]usinesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of [Plaintiffs'] lost sales were the product" of the competition the Enterprise Defendants allegedly made possible through their purportedly fraudulent conduct. *Id.*

DSMC tries to distinguish its case by arguing that *Anza* is "inapposite" because it was a tax-, not an antidumping-duties-, based case (Filing No. 29 at 15; Filing No. 67 at 13). To DSMC,

the unique purpose of the duties involved here—to thwart anti-competition dumping—transforms the "principal" victim of the fraud from the government (as is the victim in tax-based cases) to the Enterprise Defendants' business rivals (Filing No. 29 at 17; Filing No. 67 at 13). And, DSMC continues, while the "*Anza* plaintiff alleged two unrelated courses of conduct—one of which resulted in a RICO violation (tax fraud) and the other of which harmed the plaintiff (price cutting)—Defendants' conduct was specifically intended to cause precisely the alleged injury here, *i.e.*, loss of market share by domestic producers." Moreover, DSMC urges that the Court is bound by *Phoenix Bond & Indem. Co. v. Bridge*, 477 F.3d 928 (7th Cir. 2007), *aff'd*, 553 U.S. 639 (2008), where the Seventh Circuit found—and the Supreme Court unanimously affirmed—that a business competitor was the proper party to bring a RICO claim, even when predicate acts were premised on misrepresentations to the government.

However, in *Phoenix Bond*, "plaintiffs rather than the County or the property owners [we]re the immediately injured parties," and thus the proper parties to bring a RICO suit, when—in a tax lien auction context—the "County did not lose even a penny" under any fraudulent scheme and "[t]he *only* injured parties [we]re the losing bidders." *Id.* at 931–932 (emphasis in original); *see also BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 756 (7th Cir. 2011) (determining, under the same facts, that proximate cause had "no application to this case" when "[t]he *only* injury was to those bidders," and not to the county). Here, the government withstands direct pecuniary loss in the way of unpaid duties, rendering *it* the proper party to bring a RICO claim. *See Anza*, 547 U.S. at 460 (expressing the essentiality of proximate cause when "the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims."). That the putative purpose of these duties (to protect domestic market share) differs from that of an ordinary tax (to raise revenue) is no matter: RICO plaintiffs "cannot circumvent the proximate-

cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense." *Id.*

The Ninth Circuit recently echoed this conclusion when analyzing a civil RICO case brought by a competitor based on the purported funneling of imported Chinese garlic in contravention of antidumping duties:

> [Plaintiff]'s proximate cause allegations are fatally deficient with respect to this scheme. [Plaintiff] seeks to recover damages for its loss of market share, on the theory that the defendants' misrepresentations to customs officials allowed them to evade anti-dumping duties and to sell their imported garlic at less than fair value, which in turn led to an increase in their sales and a corresponding decrease in [Plaintiff]'s sales. The relationship between the defendants' unlawful conduct and [Plaintiff]'s alleged injury is too attenuated to support a finding of proximate cause for the same reasons given in *Anza*. The district court properly dismissed [Plaintiff]'s RICO claim to the extent it is predicated on the alleged funneling scheme.

*Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 651 (9th Cir. 2019) (citation omitted). To sidestep the grave application of that case, DSMC notes that this passage "was an improper advisory opinion entitled to no weight whatsoever" (since the funneling scheme was not appealed), (Filing No. 29 at 20), and that the language is not "binding on this Court" (since the Ninth Circuit does not encompass this Court), (Filing No. 67 at 13). True, the Ninth Circuit's opining on the issue may have been *obiter dictum*, and, of course, its decisions never bind this Court. But the Court finds the rationale and reasoning highly persuasive, further bolstering that *Anza* compels dismissing the claim for want of proximate cause.

Because the connection between the alleged harm of lost sales and profits that was purportedly caused by the Enterprise Defendants' Customs submissions is too attenuated to satisfy the proximate causation requirement of Section 1964(c), the Court **grants** the Enterprise Defendants' Motions to Dismiss (Filing No. 22; Filing No. 65) DSMC's civil RICO enterprise claim under 1962(c).

## 2.    **RICO Conspiracy**

RICO's Section 1962(d) prohibits entities from conspiring to violate prohibited conduct under RICO.  DSMC contends that *all* the Defendants, under DTT and Wuhan's management and direction, "knowingly and willfully agreed to facilitate and participate in the Circumvention Enterprise that would affect interstate commerce through a pattern of racketeering activity." (Filing No. 5 at 24.)   Each Defendant, DSMC argues, committed overt acts to further the conspiracy under the common objectives of the Circumvention Enterprise. *Id.* Indeed, the "Defendants agreed to engage in the above-mentioned racketeering actions to harm the domestic market for diamond sawblades and segments." *Id.*  As a result, DSMC's members have faced injury to "their business and property". *Id.*

The Court need not extensively recapitulate the parties' arguments contained in their voluminous briefing on this claim—it fails for the same reason barring the RICO Enterprise claim. Civil RICO conspiracy actions under Section 1962(d) also flow through Section 1964, which, of course, demands proximate cause. 18 U.S.C. § 1964 ("Any person injured in his business or property *by reason of* a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court.") (emphasis added).  As explained at length above, since DSMC cannot prove this essential element when the government was the chief victim of any fraudulent predicate act, *see Anza*, 574 U.S. at 458, 461, the Court **grants** the Defendants' Motions to Dismiss (Filing No. 22; Filing No. 40; Filing No. 52; Filing No. 65) for the RICO conspiracy claim.

## B.    **Lanham Act**

In its Amended Complaint, DSMC argues that "[b]y fraudulently relabeling covered Chinese merchandise as 'Thai' or 'Canadian' merchandise, or causing such Chinese merchandise to be relabeled in that manner, Defendants each have intentionally and willfully used false

designations of origin in connection with their goods, or conspired to do so" in violation of the Lanham Act.  (Filing No. 5 at 25.)  Each Defendant separately moved to dismiss, all asserting that the Amended Complaint fails to state either a "false designation of origin" or a "false advertisement" claim.  *See* 15 U.S.C §§ 1125(a)(1)(A), (B).  These arguments are separately addressed after an independent alienage-based argument from DTT Thailand and Wuhan.

### 1.    Lanham Act's reach over DTT Thailand and Wuhan

DTT Thailand and the China-based Wuhan independently argue that their "alleged conduct falls outside of the scope of the [Lanham] Act's extraterritorial application," foreclosing these claims against them.  (Filing No. 41 at 29; Filing No. 66 at 25.)  Their arguments are largely based on a three-part non-exhaustive and non-dispositive test from the Second Circuit, *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633 (2d Cir. 1956), that has been endorsed within this Circuit, *see IPOX Schuster, LLC v. Nikko Asset Mgmt. Co.*, 191 F. Supp. 3d 790, 805 (N.D. Ill. 2016) ("Under this test, courts assess three factors: (1) whether the allegedly infringing party was a United States citizen; (2) whether the party's actions affected commerce in the United States; and (3) whether any foreign trademark law conflicted with American trademark law.") (quotations omitted).  First under *Vanity Fair*, these defendants are "not [ ] United States citizen[s]." (Filing No. 41 at 30; Filing No. 66 at 25.)  This alone, these foreign defendants argue, should end the inquiry over the Act's applicability (Filing No. 41 at 30; Filing No. 66 at 26 (both citing a Fifth Circuit case, *Boureslan v. Aramco*, 857 F.2d 1014, 1029 (5th Cir. 1988), that ostensibly interprets "*Vanity Fair* to stand for the proposition that the '[Lanham] Act does not [ ] apply extraterritorially to foreign nationals'")).  Even so, the Amended Complaint "contains no allegation that [these defendants'] alleged labeling activities … affected commerce in the United States," failing to demonstrate the second prong of *Vanity Fair* (Filing No. 41 at 30; Filing No. 66 at 26).  And, these foreign

defendants urge, the "mismatch between [their] alleged Lanham Act conduct (labeling sawblades in [foreign countries]) and DSMC's alleged Lanham Act injury (loss of business from [these defendant]'s purported false statements to [the Commerce Dept.]) is fatal to the Lanham Act claim." (Filing No. 41 at 31; Filing No. 66 at 26–27.) Finally, because the Amended "Complaint contains no allegations regarding the third *Vanity Fair* factor (i.e., a conflict between the trademark laws of the United States and Thailand or Canada)," it too "does not favor extraterritorial application".  (Filing No. 41 at 31 n.4; Filing No. 66 at 27.)

In response, DSMC argues that "'when the Lanham Act plaintiff seeks to enjoin sales in the United States, there is no question of extraterritorial application.'" (Filing No. 47 at 32; Filing No. 67 at 26 (emphasis omitted) (both quoting *McBee v. Delica Co.*, 417 F.3d 107, 112 (1st Cir. 2005)).)  "Because [DSMC]'s Lanham Act claim is directed exclusively at Defendants' U.S. sales and their effects on the U.S. market," any reliance on cases involving exclusively foreign sales is inapposite. (Filing No. 47 at 33; Filing No. 67 at 27). In any event, even if the Amended "Complaint were construed as reaching extraterritorial conduct, the Lanham Act would still apply" because DTT Thailand and Wuhan's "foreign citizenship is immaterial" when the other two *Vanity Fair* factors "plainly weigh" in DSMC's favor (Filing No. 47 at 33 n.9; Filing No. 67 at 27-28 n.6). DTT Thailand and Wuhan do "not contend that the Lanham Act conflicts with applicable foreign law," so the "only issue" is the effect on U.S. commerce. (Filing No. 47 at 33-34; Filing No. 67 at 27-28). There has been at least "some effect" on U.S. commerce, DSMC contends, when its members have had to "decrease their own prices, or in some cases to cease production altogether," and the "Defendants have caused domestic confusion as to the origin of their goods." (Filing No. 47 at 34; Filing No. 67 at 28 (quotations omitted).)

In reply, DTT Thailand and Wuhan urge that DSMC's focus on "U.S. sales" to bring the claims against them under the Lanham Act misses the point:  neither of them sold "merchandise to consumers at all." (Filing No. 48 at 20; Filing No. 73 at 14–15.) Instead, DSMC alleges that Wuhan manufactured sawblades in China and DTT Thailand labeled sawblades in Thailand (Filing No. 73 at 14; Filing No. 48 at 20). The disconnect between their conduct, these defendants argue, and DSMC members' injuries parries the Lanham Act's reach. Finally, because DSMC alleges that it lost sales because of "circumvention of the antidumping order" and not due to "confusion among U.S. consumers," the Lanham Act does not encompass DSMC's theory of harm. (Filing No. 48 at 20–21; Filing No. 73 at 15.)

DTT Thailand and Wuhan are not "United States citizen[s]," and no one contends that enforcing the Lanham Act here would create any "conflict with trade-mark rights established under the foreign law." *See Vanity Fair*, 234 F.2d at 642.  This leaves only the question of whether DTT Thailand and Wuhan's "conduct had a substantial effect on United States commerce." *Id.*  To this, the Court prudently answers yes.  In a well-reasoned and persuasive case from within this Circuit, another district court held that a plaintiff did not show "any effect on United States commerce" when no purportedly infringing products had entered the United States. *Champion Labs., Inc. v. Cent. Illinois Mfg. Co.*, 157 F. Supp. 3d 759, 767 (N.D. Ill. 2016) (also collecting similar cases); *cf. Scotch Whisky Association v. Barton Distilling Co.*, 489 F.2d 809, 812–13 (7th Cir. 1973) (holding Lanham Act's territorial requirements satisfied when the defendant had sold the allegedly infringing product in the Panama Canal Zone, which was then part of United States territory). Here, unlike in *Champion Labs.*, the diamond sawblades directly entered the U.S. market, significantly altering the landscape of the industry. *ACG Prod., Ltd. v. Gu*, No. 10-CV-716-WMC, 2011 WL 7748354, at *3 (W.D. Wis. Nov. 4, 2011) (noting that *Vanity Fair*'s second "factor is

most commonly met by allegations that the infringing end products produced in a foreign country subsequently entered the United States or one of its territories"). This domestic entry suffices to satisfy *Vanity Fair*'s second prong. *See* 234 F.2d at 642. Weighing this factor against the other two, the Court cautiously finds that the Lanham Act reaches these Defendants because of their conduct's substantial impact on United States commerce. But just because these foreign Defendants cannot duck this threshold question does not mean that the substantive Lanham Act claims against them, and the other Defendants, are not fatally flawed.

2. <u>False designation of origin under the Lanham Act</u>

The Defendants argue, largely repetitively, that a false designation claim under 15 U.S.C. § 1125(a)(1)(A) of the Lanham Act "lies only where a plaintiff alleges 'customer confusion between a defendant and a plaintiff or between a defendant's goods or services and a plaintiff.'" (Filing No. 23 at 27 (quoting *Brownstone Publ'g, LLC v. AT&T, Inc.*, No. 1:07-cv-1630, 2009 U.S. Dist. LEXIS 25485, at *18 (S.D. Ind. Mar. 24, 2009); Filing No. 41 at 31; *see* Filing No. 53 at 14.)) In other words, "[a] 'false designation of origin' claim lies only where 'the work at issue originated with the plaintiff' and that 'origin of the work was falsely designated by the defendant.'" (Filing No. 23 at 27 (quoting *Landmark Signs, Inc. v. ICU Outdoor Advert., LLC*, No. 2:16-cv-128, 2017 U.S. Dist. LEXIS 47245, at *4–5 (N.D. Ind. Mar. 30, 2017)) (citation and emphasis omitted); Filing No. 41 at 26; *see* Filing No. 53 at 14.) "[B]ecause the [Amended] Complaint fails to allege that Defendants' purported relabeling suggested that their imported diamond sawblades were in any way associated with Plaintiffs' products," the Lanham Act claim for false designation of origin must fail (Filing No. 23 at 27; *see* Filing No. 41 at 32; *see* Filing No. 53 at 14). Moreover, the Defendants argue, the Complaint fails to identify any "specific marketing device" through which they purportedly misrepresented the sawblades. (Filing No. 23 at 27-28.) Further,

"[a]llegations of false geographic origin may be made only as a false advertising claim, not a false association claim," Defendants contend.  (Filing No. 41 at 29; Filing No. 66 at 25.)  On top of all this, the Amended Complaint is completely silent as to "any effect on consumers whatsoever." (Filing No. 23 at 28 (emphasis omitted).)  DTT and Wanbang, as well as Wuhan, conclude that the Amended "Complaint sets forth not one allegation linking [them] to alleged relabeling or mislabeling." (Filing No. 23 at 27; Filing No. 66 at 28 (emphasis omitted).)

In response, DSMC argues, relying on a three-part test provided by *Web Printing Controls Co. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1204 (7th Cir. 1990), that its Amended Complaint successfully states a claim by alleging that "Defendants attached and used false Thai and Canadian labels in connection with their goods; the Defendants imported and sold those goods throughout interstate commerce; and that Plaintiffs, the domestic producers of similar products, have been damaged and will continue to be damaged by Defendants' conduct."  (Filing No. 29 at 35; Filing No. 61 at 16.)  Further, DSMC urges that false designation of origin claims include "geographic location" within the meaning of origin (Filing No. 29 at 35; Filing No. 47 at 34-35; Filing No. 61 at 17; Filing No. 67 at 29 (citing *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003)). Additionally, DSMC contends that these types of claims do not require specific marketing devices.  (Filing No. 29 at 36; Filing No. 67 at 30.)  Finally, DSMC concludes that its Amended Complaint apprised Wuhan of its role in the mislabeling scheme by alleging "that Wuhan intentionally 'funnel[s] underpriced merchandise' to sham third-country affiliates (including a wholly-owned affiliate), 'with the knowledge and intent that those goods will be fraudulently misidentified as Thai or Canadian goods to circumvent applicable dumping duties.'" (Filing No. 67 at 30 (quoting Filing No. 5 at 16).)

In reply, the Defendants assert again, that "allegations of false geographic origin may be made only as a false advertising claim, not a false association claim." (Filing No. 30 at 21; *see* Filing No. 48 at 22; *see* Filing No. 64 at 12-14 (for detailed statutory analysis); Filing No. 73 at 16.)  In turn, DSMC has continued to fail to "allege confusion between [its members'] sawblades and those of Defendants."  (Filing No. 48 at 23.)  Finally, DTT and Wanbang, as well as Wuhan, note that, still, neither the Amended Complaint nor DSMC's response brief "allege that [they] had anything to do with the relabeling," as demanded by Rule 9(b)'s heightened fraud pleading standard (Filing No. 30 at 22; Filing No. 73 at 17.)

Under the Lanham Act's "false designation" provision, no entity can use "any false designation of origin" of its goods that is "likely to cause confusion, or to cause mistake, or to deceive" as to (1) "affiliation, connection, or association" *with another entity* or (2) "origin, sponsorship, or approval" of its goods *by another entity*. 15 U.S.C. § 1125(a)(1)(A); *see also Summit Tech., Inc. v. High-Line Med. Instruments*, Co., 933 F. Supp. 918, 928 (C.D. Cal. 1996) (instructing, while referencing a leading treatise, that to succeed on a false designation of origin claim, a plaintiff must prove, among other things, "the designation or false designation is likely to cause confusion, mistake, or deception as to (a) the affiliation, connection, or association of defendant with another person, or (b) as to the origin, sponsorship, or approval of defendant's goods, services, or commercial activities by another person") (citing 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27.03 [1] [a]).

This section of the Lanham Act requires that customers likely be, in other words, tricked into thinking that products are affiliated with or approved by another party.  *See Syngenta Seeds, Inc. v. Delta Cotton Co-op., Inc.*, 457 F.3d 1269, 1277 (Fed. Cir. 2006) (instructing that to state a plausible claim under § 1125(a)(1)(A), a plaintiff must allege, among other things, "that the false

designation of origin was likely to cause consumer confusion" as to who actually produced a good). DSMC's relies on the test ostensibly provided by *Web Printing Controls*—that is, that it need only prove that the (1) "defendant used in connection with goods or services a false designation of origin or false description or representation," (2) "defendant caused such goods and services to enter into commerce," and (3) "plaintiff is a person who believes that he or she is likely to be damaged as a result thereof," 906 F.2d at 1204 (quotation omitted). This reliance is misplaced when the very next sentence in that opinion restates the final requirement as "the likelihood that *consumers will be confused* by [a defendant]'s material misbranding," *id.* (emphasis added).

This is where DSMC's Amended Complaint falters – nowhere does it allege that any mislabeling regarding national origin would likely dupe the consuming public into buying the products of Defendants instead of those of its members. *See id.* at 1205 ("The test to be used in determining whether a violation has occurred is whether the evidence indicates a likelihood of confusion, deception or mistake on the part of the consuming public.") (quotation omitted).   In fact, any false designation would indicate that the sawblades were products of Thailand or Canada, not of U.S. provenance like those of the domestic manufacturers.  Simply put, setting aside whether allegations of false geographic origin may even be made as "false association" or "false endorsement" claims, (*see* Filing No. 64 at 12–14), DSMC has failed to allege any likelihood of consumer confusion.  Indeed, according to the entire theory of its case, this mislabeling was done to evade the antidumping order and deceive Customs, not fool consumers into purchasing their products through confusion that they originated elsewhere (Filing No. 5 at 16–18). In particular, "DTT Thailand and DTT Canada each knowingly receive covered merchandise from Wuhan and repackage it to facilitate the Circumvention Enterprise's circumvention and evasion of the Antidumping Order[,] tak[ing] affirmative steps to remove indicia of Chinese origin from the

covered merchandise and replace it with fraudulent indicia of Thai or Canadian origin. . . . [The Defendants] conducted the procedure solely to conceal their circumvention efforts". The slim likelihood of consumer confusion confounds any false designation of origin claim under § 1125(a)(1)(A) of the Lanham Act.  Accordingly, the Court **grants** the Defendants' Motions to Dismiss (Filing No. 22; Filing No. 40; Filing No. 52; Filing No. 65) as to that allegation.

### 3.      False advertising under the Lanham Act

The Defendants also argue that, to the extent that it makes a false advertising claim under § 1125(a)(1)(B) of the Lanham Act, the Amended "Complaint contains no allegations suggesting any 'commercial advertisement'" or "that the 'Thai' or 'Canadian' labels were 'likely to influence the purchasing decision.'"  (Filing No. 23 at 23 (quoting *Maschino v. Wayt*, No. 1:14-cv-639, 2016 U.S. Dist. LEXIS 150126, at *8 (S.D. Ind. Oct. 31, 2016); *see* Filing No. 53 at 15 ("The Amended Complaint is utterly devoid of any allegations of false advertising made by DTT Canada"); Filing No. 66 at 29.)  DTT Thailand adds that any statement of Thai origin is not "'actually false' . . . because those sawblades are allegedly produced in, and shipped from, Thailand." (Filing No. 41 at 33.)  DTT Canada adds that the "Amended Complaint is utterly devoid of any allegations of false advertising made by DTT Canada that come remotely close to pleading a claim with particularity," (Filing No. 53 at 15), as required by Rule 9(b).  Indeed DTT Canada continues, the Amended Complaint contains "not one allegation that DTT Canada sold a single diamond sawblade in interstate commerce that contained either literally false or materially misleading statements of geographic origin." *Id.* at 16.

In response, DSMC argues that "false labeling [was] done for the specific purpose of importing Wuhan's goods into interstate commerce," which, in turn, "resulted in clear harm to Plaintiffs, the domestic industry." (Filing No. 29 at 33; *see* Filing No. 61 at 20; Filing No. 67 at

31.) Additionally, this mislabeling constitutes "advertising" under the statute because "labels routinely have been found to suffice" for violations. (Filing No. 29 at 33; Filing No. 67 at 31.) Further, while "the materiality of a literally false statement is presumed" when it comes to the influence of a consumer's purchasing decision, "the materiality of the Defendants' misrepresentation may be reasonably inferred" when, for example, "some consumers may tend to view products originating from China as inferior in quality or as inherently damaging to the domestic economy." (Filing No. 29 at 34; Filing No. 47 at 37; Filing No. 67 at 32-33.) Moreover, the "false labels enabled them to sell the products at issue well below fair value—i.e., at much cheaper prices—which plainly influences consumers' purchasing decisions." (Filing No. 29 at 34; Filing No. 47 at 37.)

Specifically responding to DTT Thailand, DSMC argues that its argument "ignores the Government's explicit findings that its *de minimis* assembly of Chinese parts did not make them Thai in origin", rendering any contrary statement literally false.   (Filing No. 47 at 36.) The Amended "Complaint adequately describes DTT Thailand's deception irrespective of the Government's ultimate findings" on this point when the goods were "not actually made in Thailand." *Id.* at 36-37. And in response to DTT Canada, DSMC adds that the Amended "Complaint describes precisely the nature of DTT Canada's participation in the false designation conduct[, ] explain[ing] that after receiving sawblades from Wuhan, both 'DTT Thailand and DTT Canada take affirmative steps to remove indicia of Chinese origin from the covered merchandise and replace it with fraudulent indicia of Thai or Canadian origin.'" (Filing No. 61 at 18 (quoting Filing No. 5 at 16-17).)   "These allegations plainly apprise DTT Canada of the nature of [its] participation in the fraud," DSMC contends, as required by Rule 9(b). *Id.* at 18 (quotation omitted).

23

In reply, the Defendants continue to argue that any "labeling is not 'actually false,' as the standard requires …, because those sawblades are allegedly produced in, and shipped from, Thailand and Canada." (Filing No. 30 at 21; Filing No. 73 at 16; *see* Filing No. 48 at 21.) Because the labels were not actually false, "they cannot be presumed to have deceived consumers or been material to consumers' purchasing decisions" and "DSMC cannot duck this requirement by advancing the protectionist notion that materiality may be inferred because consumers consider Chinese-made products 'as inferior in quality' or are otherwise biased against Chinese products." (Filing No. 30 at 21-22; Filing No. 73 at 16-17; *see* Filing No. 48 at 21-22.) Indeed, DSMC's "conclusory allegation that the labeling conduct 'resulted in clear harm to Plaintiffs' is not a substitute for factual material plausibly suggesting injury." (Filing No. 30 at 22; Filing No. 73 at 17; *see* Filing No. 48 at 22.) On top of this, Defendants argue that the Amended Complaint fails to apprise DTT and Wanbang, DTT Canada, and Wuhan, with specificity, as to their involvement in any false advertising, contrary to the heightened pleading demanded by Rule 9(b) in these claims (Filing No. 30 at 22-23; Filing No. 64 at 14; Filing No. 73 at 17-18).

To state a false advertising claim under the Lanham Act, 15 U.S.C. § 1125(a)(1), a plaintiff must show that a defendant: (1) made a false or misleading statement; (2) that actually deceives or is likely to deceive a substantial segment of the advertisement's audience; (3) on a subject material to the decision to purchase the goods; (4) touting goods entering interstate commerce; and (5) that results in actual or probable injury to the plaintiff. *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir. 1999). False statements under the Lanham Act fall into two categories: (1) commercial claims that are literally false as a factual matter; and (2) claims that are literally true or ambiguous, but convey a false impression or mislead in context. *Hot Wax, Inc. v. Turtle Wax. Inc.*, 191 F.3d 813, 820 (7th Cir. 1999). While plaintiffs need not prove that false statements

actually deceived anyone or were likely to do so, *id.*, they are not excused from showing that false statements would materially affect a consumer's decisions to buy a product, *see Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 311 (1st Cir. 2002) (Even after "defendants concede that they have made a false or misleading statement of fact[,] . . . [t]he materiality component of a false advertising claim requires a plaintiff to prove that the defendant's deception is likely to influence the purchasing decision.") (quotation omitted).

Here DSMC's claim falls short: nowhere does it allege, even if they were "actually false," how the labels would materially affect a consumer's purchasing choice. In fact, DSMC's Amended Complaint states that mislabeling merely "allowed Defendants to circumvent the Antidumping Order and sell underpriced goods in violation of the law." (Filing No. 5 at 25.) To supplement this shortcoming, DSMC argues in its response briefing that the "Thai" and "Canada" labeling would steer more customers to the sawblades because "some consumers may tend to view products originating from China as inferior in quality or as inherently damaging to the domestic economy", and that the "false labels enabled them to sell the products at issue well below fair value—*i.e.*, at much cheaper prices—which plainly influences consumers' purchasing decisions." (Filing No. 29 at 34; Filing No. 47 at 37; Filing No. 67 at 32-33.) But even if these rationales persuasively expressed materiality as to consumer choice, "[i]t is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989). Because this belated explication cannot cure the elemental inadequacy of DSMC's claim, the Court **grants** the Defendants' Motions to Dismiss (Filing No. 22; Filing No. 40; Filing No. 52; Filing No. 65) for false advertising under § 1125(a)(1)(B) of the Lanham Act.

C.      <u>State law claims</u>

DSMC pleaded that the Court had jurisdiction over the case because the claims dismissed

above arose under the laws of the United States, *see* 28 U.S.C. § 1331; Filing No. 5 at 6.  Ordinarily,

after all federal claims have been dismissed, the default rule is that federal courts should not decide

related state-law claims because

> [n]eedless decisions of state law should be avoided both as a matter of comity and
> to promote justice between the parties, by procuring for them a surer-footed reading
> of applicable law. Certainly, if the federal claims are dismissed before trial, even
> though not insubstantial in a jurisdictional sense, the state claims should be
> dismissed as well.

*United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (internal footnotes omitted); *see*

28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over

a claim under subsection (a) if . . . the district court has dismissed all claims over which it has

original jurisdiction.").  Sometimes, of course, a district court should retain supplemental

jurisdiction even when it dismisses the federal claims.  *See Carnegie-Mellon University v. Cohill*,

484 U.S. 343, 350 n.7 (1988) (listing "judicial economy, convenience, fairness, and comity" as

"factors to be considered under the [supplemental] jurisdiction doctrine"); *see also Sharp Elecs.*

*Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514–15 (7th Cir. 2009) (acknowledging three

exceptions to the general rule: "when (1) the statute of limitations has run on the pendent claim,

precluding the filing of a separate suit in state court; (2) substantial judicial resources have already

been committed, so that sending the case to another court will cause a substantial duplication of

effort; or (3) when it is absolutely clear how the pendent claims can be decided.") (quotations

omitted).

But that is not the case here.  Any state law claims would be tolled following DSMC's

filing in this Court.  *See, e.g., Torres v. Parkview Foods*, 468 N.E.2d 580, 583 (Ind. Ct. App. 1984)

(holding "that when in good faith a plaintiff brings an action in federal court within the statute of limitations, but it fails for lack of diversity jurisdiction, the statute of limitations is tolled with the filing of the suit for purposes of determining whether a subsequent state action involving the same parties and the same claims is brought within the statute of limitations"). DSMC's state law claims are not particularly well-developed: its Amended Complaint devotes only approximately two of its twenty-nine pages to them (Filing No. 5 at 25-28). The Defendants respond correspondingly sparsely in their respective motions to dismiss: DTT and Wanbang, with roughly four of thirty-four pages (Filing No. 23 at 23-27); DTT Thailand using approximately five of thirty-nine pages (Filing No. 27-32); DTT Canada, using less than three of twenty-one pages (Filing No. 53 at 17-19); and Wuhan by means of five of thirty-five pages (Filing No. 66 at 29-34). *Cf. Sharp*, 578 F.3d at 515 (7th Cir. 2009) ("[W]e are not prepared to say that the proper resolution of the state-law claims is absolutely clear."). No discovery has been conducted. *See id.* ("[T]he district court disposed of the federal claims on a motion to dismiss, and so it is difficult to see how 'substantial judicial resources' have been committed to this case."). On balance, "the nature of the state law claims at issue, their ease of resolution, and the actual, and avoidable, expenditure of judicial resources" weighs against the retention of supplemental jurisdiction in this case. *Hansen v. Bd. of Trustees of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 608 (7th Cir. 2008) (quotation omitted).

Because generally after "a court has dismissed all the federal claims in a lawsuit before trial, it should relinquish jurisdiction over supplemental state law claims rather than resolve them on the merits," *Cortezano v. Salin Bank & Tr. Co.*, 680 F.3d 936, 941 (7th Cir. 2012) (citations omitted), the Court **grants** the Defendants' Motions to Dismiss (Filing No. 22; Filing No. 40; Filing No. 52; Filing No. 65) regarding DSMC's claims for predatory pricing, tortious interference, and civil conspiracy under Indiana law.

27

## IV.    CONCLUSION

For the preceding reasons, the Defendants' Motions to Dismiss are **GRANTED** (Filing No. 22; Filing No. 40; Filing No. 52; Filing No. 65). DSMC's civil RICO Enterprise and RICO Conspiracy claims are **dismissed with prejudice,** because an amendment on these claims would be futile.  DSMC's Lanham Act claims and state law claims are **dismissed without prejudice**.[2] DSMC has fourteen (14) days from the date of this Order to file a Second Amended Complaint if such a filing is not an exercise in futility.  If nothing is filed, final judgment will issue upon expiration of the deadline.

**SO ORDERED.**

Date:   11/30/2020

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Spiro Bereveskos
WOODARD EMHARDT HENRY REEVES & WAGNER, LLP
judy@uspatent.com

Blake R. Hartz
WOODARD EMHARDT HENRY REEVES & WAGNER, LLP
bhartz@uspatent.com

Kandi Kilkelly Hidde
FROST BROWN TODD LLC (Indianapolis)
khidde@fbtlaw.com

J. Frank Hogue
WHITE & CASE LLP
fhogue@whitecase.com

---

[2] Although titled Amended Complaint, in light of a technical issue in filing the original Complaint, Plaintiffs refiled the original Complaint the same day and, at the Court's request, styled it "Amended Complaint." No substantive changes were made. "[A] plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed." *Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015). Unless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss." *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Comm'n,* 377 F.3d 682, 687 & n. 3 (7th Cir.2004).

Kristopher N. Kazmierczak
KATZ  KORIN CUNNINGHAM, P.C.
kkaz@kkclegal.com

Claire L. Leonard
WHITE & CASE LLP
claire.leonard@whitecase.com

Stephen J. Obermeier
WILEY REIN LLP
sobermeier@wiley.law

Daniel B. Pickard
WILEY REIN LLP
dpickard@wileyrein.com

Brooke Smith
KATZ  KORIN CUNNINGHAM, P.C.
bsmith@kkclegal.com

Enbar Toledano
WILEY REIN LLP
etoledano@wileyrein.com

Timothy L. Wilson, Jr.
WHITE & CASE LLP
timothy.wilson@whitecase.com

Sally F. Zweig
KATZ  KORIN CUNNINGHAM, P.C.
szweig@kkclegal.com